NOT FOR PUBLICATION IN WEST'S HAWAII REPORTS OR THE PACIFIC REPORTER

**Electronically Filed**
**Intermediate Court of Appeals**
**29287**
**13-MAY-2011**
**08:26 AM**

NO. 29287

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee/Cross-Appellant, v.
KIRK MATTHEW LANKFORD, Defendant-Appellant/Cross-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 07-1-0822)


MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Reifurth and Ginoza, JJ.)

Defendant-Appellant/Cross-Appellee Kirk Matthew Lankford ("Lankford") appeals from the Judgment of Conviction and Sentence, filed July 31, 2008 ("Judgment") in the Circuit Court of the First Circuit ("Circuit Court").[1] Lankford was convicted by a jury of Murder in the Second Degree in violation of section 707-701.5, Hawaii Revised Statutes ("HRS"),[2] for his role in the death of a young female Japanese national, Masumi Watanabe ("Watanabe"). Watanabe was last seen by witnesses getting into Lankford's work truck on the morning of April 12, 2007. Lankford was sentenced to incarceration for life with the possibility of parole.

On appeal, Lankford contends that: (1) it was an abuse of discretion and a denial of due process and compulsory process for the Circuit Court to preclude him from calling his accident reconstruction witness, Clyde Calhoun ("Calhoun"), on surrebuttal; (2) defense counsel's failure to call an accident

---

[1] The Honorable Karl K. Sakamoto presided.

[2] "Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person." HAW. REV. STAT. § 707-701.5(1) (1993).

reconstruction witness during Lankford's case-in-chief constituted ineffective assistance of counsel; (3) the Circuit Court plainly erred by failing to instruct the jury regarding the definition of "crime;" (4) the jury instructions were prejudicially erroneous and misleading because they failed to specify that the state of mind elements applied to all elements of the omission alternative; (5) the Circuit Court's denial of his motion to continue was an abuse of discretion; (6) the Circuit Court abused its discretion by admitting photographs of his wife; (7) prosecutorial misconduct deprived him of his constitutional right to a fair trial; (8) the jury's verdicts unanimously finding him guilty by omission and commission were inconsistent; and (9) his conviction was not supported by substantial evidence.

Plaintiff-Appellee/Cross-Appellant State of Hawai'i ("State") cross-appeals from the Findings of Fact, Conclusions of Law, and Order Taking No Further Action on State's Motion for Sanctions Against Donald L. Wilkerson for Failure to Provide Discovery ("Order Denying Sanctions"), filed September 10, 2008. The State contends that the Circuit Court abused its discretion in not sanctioning defense counsel for his "intentional, willful, and insistent refusal to comply with the court's orders regarding discovery."

We affirm.

I.  BACKGROUND

A.  Watanabe's Death

On April 12, 2007, at approximately 9:15 a.m., Watanabe, a visitor from Japan, was dropped off at lower Pūpūkea Road in Pūpūkea, Hawai'i, by a relative with whom she was staying. Watanabe was dropped off at the same location almost every morning at approximately the same time so that she could get exercise by walking home. The walk home would usually take between 30-40 minutes.

Lankford was a residential pest control treatment technician with Hauoli Termite & Pest Control. That morning, after making a service call on one of his pest control treatment

2

customers, Lankford met Watanabe. It is undisputed that Watanabe died during her encounter with Lankford. The State argued that Lankford murdered Watanabe, while Lankford contended that Watanabe died when she jumped out of his truck as he drove her around the Pūpūkea neighborhood, in search of her home. The following evidence was presented at trial:

B.    The State's Case-In-Chief

Two witnesses testified at trial to seeing Watanabe on Pūpūkea Road between 9:20-9:40 a.m. on April 12, 2007, with a man resembling Lankford, who was standing next to a white work truck. One of the witnesses testified that the woman, who appeared "stressed" and "a little bit agonized," seemed to be waiving away a man who resembled Lankford, and to be saying the word "no." The other witness testified that she saw the name of Lankford's employer on the work truck, that the man was wearing coveralls, and that she saw the woman climb into the work truck from the driver's side.

Another witness testified to seeing a man, whom he subsequently identified as Lankford, digging a hole at the Kahana Fishpond later that evening at approximately midnight. When the witness questioned him, Lankford hurried to his truck and drove away. The license plate number recorded by the witness traced back to Lankford's work truck.

Additional evidence included testimony from Watanabe's mother, who explained that her daughter was extremely shy and unlikely to willingly get into a stranger's vehicle; photographs showing scratches on Lankford's hands shortly after his arrest, and expert testimony concluding that the scratches were consistent with fingernail marks; testimony that blood matching Watanabe's DNA profile was found in Lankford's work truck on the passenger door panel, the front of the passenger side of the truck, and the driver's side door; and a pair of glasses found in Lankford's work truck matching Watanabe's prescription, from which DNA matching Watanabe's profile was removed.

C.    The Defense's Case-In-Chief

Prior to trial, Lankford had denied ever encountering Watanabe. During his case-in-chief, however, Lankford admitted that he had lied to the police, testifying that he accidently "kind of sideswipe[d]" Watanabe, who was walking alongside the road, with his truck after he had turned left from Aukauka Road onto Pūpūkea Road sometime after 9:20 a.m. on April 12, 2007 ("First Incident").

Lankford testified that he did not report the accident to his employer because he feared losing his job. Instead, he offered Watanabe "a ride to wherever she was going[,]" which she accepted. He had trouble communicating with her, however, as she did not appear to speak much English.

Lankford testified that, after driving through the neighborhood for a period of time, Watanabe became upset and began screaming. Lankford and Watanabe were yelling at each other, with Watanabe apparently not understanding Lankford, and Lankford trying to persuade Watanabe to calm down.

Watanabe "got really quiet." A moment later, as Lankford drove on Makana Road (lower Pūpūkea) at a speed of approximately 35-40 mph, Watanabe quickly opened the passenger door and dove out of the truck ("Second Incident"). Lankford turned the truck around to look for Watanabe and found her lying on the side of the road with her head "punctured" or "cracked . . . open" and "misshapened". Watanabe did not appear to be breathing and Lankford could not locate a pulse or heartbeat.

Worried that he was going to lose his job, Lankford placed Watanabe's body in the back of his work truck and drove to within view of his next scheduled job site, where he sat, crying and praying. Lankford concluded then to "try to make the whole situation go away[,]" placing Watanabe's head in a plastic bag and moving her body to the big compartment on the passenger's side of the truck cab, which he then closed down and locked.

Lankford completed his second scheduled pest treatment service of the morning, and proceeded to Foodland where he purchased items intended to facilitate his subsequent disposal of Watanabe's body. After completing his assignments for the day,

he returned to the office where he cleaned dried blood off the back of his tailgate. Lankford completed his paperwork for the day, called customers for the next day, and headed home.

Lankford took his personal vehicle, picked up his wife and son, and, together, the family went to church for band practice. After band practice, Lankford dropped his wife and son off at home and went to Home Depot where he purchased a shovel, plastic bags, flashlight and duct tape. Lankford then returned to work where his truck with Watanabe's body was parked. He moved the body from his work truck to his personal truck, placed it inside another bag, taped up the bag, and placed the bag containing the body inside yet another bag, which he also taped.

Lankford attempted to bury Watanabe's body that night at Kahana Bay. After being observed and then questioned by a witness as he began to dig a grave, however, he abandoned his plan and put Watanabe's body into the ocean near Kualoa Ranch.

D.    The State's Rebuttal Expert

Whether and in what order the parties would present testimony from expert accident reconstruction witnesses was discussed repeatedly with the Circuit Court before and throughout the trial. On January 22, 2008, the Circuit Court found that Lankford had not complied with discovery deadlines, and that special circumstances required that each side be allowed to depose the other's accident reconstruction witness. Lankford's counsel objected, noting that he had not determined whether to present an accident reconstruction witness, having not determined yet whether to present a case at all. Counsel advised that he had instructed his witness, if contacted, not to speak to the State,[3] and that if the Circuit Court ordered that depositions be allowed, he would remove the witness from his witness list and present him, if at all, only on rebuttal. The Circuit Court warned Lankford that if he failed to notify the State of his witnesses, he would not be able to call them at trial.

---

[3]    Almost two months later, counsel clarified that he had been mistaken previously, and that he had not instructed any witnesses, including Calhoun, not to speak to the State.

The issue was raised again on February 15, 2008, at the hearing on Lankford's motion to exclude the State's expert witnesses. The Circuit Court denied the motion, noting that whether the State would offer an accident reconstruction expert witness depended on the specific defense that Lankford would offer, and whether he would be calling an accident reconstruction witness.

On March 19, 2008, during Lankford's case-in-chief, the Circuit Court told Lankford to call his accident reconstruction witness the next day, warning that if Lankford delayed the presentation of his witnesses in order to gain a tactical advantage, he may lose the opportunity to call them.

On March 20, 2008, as Lankford approached the end of his case-in-chief, the Circuit Court and the parties discussed the remaining defense witnesses. Lankford's counsel advised that he wished to present Dr. James Navin, the defendant, and one other witness. When asked whether the accident reconstruction witness was going to testify, Lankford's counsel said, "It doesn't look like it." The Circuit Court said, "So these are your remaining witnesses[?]" and counsel responded, "Right." Later, the Circuit Court noted that there was one defense witness, in addition to Lankford himself, yet to be called. The Circuit Court observed that "[t]hrough previous discussions this morning, it's the Court's understanding that the accident reconstructionist, Mr. Calhoun, will not be called by the defense." Lankford's counsel noted that he also wished to recall Dr. Navin, but, with that addition, agreed that these were his remaining three witnesses.

On April 3, 2008, after Lankford testified and described how he had encountered Watanabe and how she died, the State informed the Circuit Court that it would call its accident reconstruction witness, Kenneth Baker ("Baker"), on rebuttal after the defense closed its case-in-chief. Defense counsel argued that, by permitting the State to present its reconstruction witness on rebuttal, while requiring the defense to offer its own reconstructionist during its case-in-chief, the Circuit Court was treating the parties differently:

6

[Defense counsel]: Judge, time has always been an issue here, and now I have to plan for surrebuttal. How am I to plan for surrebuttal -- these are the same arguments that Mr. Carlisle merely had to bring up to the court and the court granted them, and I have to beg for them.

THE COURT: We'll take that issue as it comes. You should be -- well, you had your case-in-chief. I don't know what witnesses you're going to use for surrebuttal. We'll find out based on what the State presents. But if it's a witness you could have called in your case-in-chief, then we'll have to look at that issue also.

[Defense counsel]: So witnesses then -- just for clarification, witnesses that could have been called in the case-in-chief and issues that could have been addressed in the case-in-chief through the same witness cannot be brought up either in rebuttal or surrebuttal?

THE COURT: You're asking me for a generic ruling on that. It depends on the facts, and we'll take it up as they arise.

. . . .

THE COURT: The basic entirety of the defense's case was raised beginning with your opening statement. The State was not apprised of the exact defense.

[Defense counsel]: And I had no obligation. Why am I continually attacked for not -- for merely following the rules --

THE COURT: Well, you're not being attacked. The court is just stating that once the State understands what position you're taking, then they have a right to rebut it. Until that time, they don't know what to rebut. And they've pretty much followed that once they understand what your position was, they are seeking to rebut it. And I'll give them that opportunity.

[Defense counsel]: And, judge, if that's the rule and if that's what's going to be followed in this court, I ask that I be given those same -- the same rules that would apply to my surrebuttal that Mr. Carlisle has been harping about for months with regards to his rebuttal. And now one day before his rebuttal and I'm not given the name of witnesses other than two.

THE COURT: You know, I can't predict what witnesses you might need to rebut or surrebut the State's case. But as it comes up, you can raise it, and we'll examine it. I'm not seeking to intentionally deny you an opportunity, but I don't know what facts are in front of us so we'll have to wait.

Despite the Circuit Court's warning, and even though he called other witnesses the following day, Lankford's counsel rested his case-in-chief without calling his accident reconstruction witness.

On rebuttal, Baker raised questions about Lankford's explanation of both the First and Second Incidents. On cross-

examination, however, Baker conceded a variety of factors with regard to his criticism of the Second Incident, such that the State agreed that Lankford's version was theoretically possible.

E.   Lankford's Motion To Allow Surrebuttal Witnesses

At a status conference on April 8, 2008, the State advised that it had completed its rebuttal case, and Lankford's counsel stated that he intended to call Calhoun and two others as surrebuttal witnesses.  The Circuit Court then heard argument from the parties on Lankford's motion to allow surrebuttal witnesses.

In his offer of proof, Lankford argued that Calhoun would testify that it was possible for Watanabe to have jumped out of Lankford's work truck, as Lankford had testified.  The Circuit Court denied the motion as to Calhoun, finding that Lankford had been given the opportunity to present his accident reconstruction witness during his case-in-chief, but that he had deliberately delayed calling the witness until surrebuttal in order to gain a tactical advantage.[4/]  The Circuit Court allowed

_____

[4/]     THE COURT:  That point, as to the accident reconstructionist expert, Mr. Calhoun, both parties were asked to prepare their experts well in advance of this trial, and Mr. Calhoun was hired by the defense, I guess, months ago . . . so clearly, the defense had available to it an expert witness and had available to it the opportunity to prepare the expert with regard to testimony in the trial proceedings themselves here.

You at no time were prevented from calling Calhoun in your case in chief.  His testimony would have supported -- could have supported your client's, Mr. Lankford's testimony on critical issues regarding:

1.  As was brought out on cross-examination whether or not he struck Ms. Watanabe in the manner defendant testified; and

2.  Whether she received fatal injuries from either the rock or ground from a speeding car as related by your client.

So on these matters, it was well within your expert's ability and your ability to call him in your case in chief to establish those points.  You failed to do so.

In that regard, the Court does not find it appropriate to allow you a tactical advantage to not call a witness in your case in chief so that you can have the last say, so to speak, to rebut the State's introduction of its expert testimony.

the defense to present Mark Hagadone as a surrebuttal witness on an issue first raised on rebuttal, but disallowed a third proposed witness who had previously testified in the case and whose proposed testimony, the Circuit Court concluded, would be cumulative.

Lankford's counsel conceded that tactics governed his decision not to call Calhoun. If he was mistaken in that decision, counsel argued, that reflected his own ineffectiveness, but should not prohibit Lankford from contesting Baker's credibility through the introduction of expert testimony. The Circuit Court concluded, however, that Calhoun's testimony did not so much rebut Baker's testimony as it supported Lankford's and, as such, should have been presented as part of Lankford's case-in-chief:

> THE COURT: You know, the terminology of attacking the credibility, basically Baker testified in one fashion, and your expert, Calhoun, is testifying in a different manner. He has a different opinion. His different opinions, again, could have been introduced in your case in chief.

II. DISCUSSION

    A.    It Was Not An Abuse Of Discretion Or Denial Of Lankford's Right To Compulsory Process For The Circuit Court To Deny Lankford's Motion To Allow Surrebuttal Witnesses

        1.    Abuse of Discretion

Lankford contends that it was an abuse of discretion and a denial of his right to compulsory process under the sixth and fourteenth amendments to the United States Constitution and article I, §§ 5, 10 and 14 of the Hawai'i Constitution for the Circuit Court to deny his motion to allow surrebuttal witnesses. "[T]he introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and the appellate courts will not interfere absent an abuse thereof." _State v. Duncan_, 101 Hawai'i 269, 274, 67 P.3d 768, 773 (2003)

---

> You had the clear opportunity to do so. You made the tactical decision not to. The Court will not allow that testimony.

(quoting *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996)) (internal quotation marks omitted).

The Hawai'i Supreme Court has followed three general rules regarding rebuttal evidence:

> First, as a general rule, a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of his or her case and then offer it on rebuttal. Second, this general rule does not necessarily apply where the evidence sought to be presented on rebuttal is "negative of a potential defense," even if the evidence is also confirmatory of an affirmative position upon which the party seeking to present the evidence bears the burden of proof. Third, although a plaintiff is not required to call, during his or her case-in-chief, every conceivable witness who might contradict a potential defense witness, it is also generally true that
>
> > [a] party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence and, while the court may in its discretion admit such evidence, it may and generally should decline to admit the evidence.
>
> *Takayama*, 82 Hawai'i at 497, 923 P.2d at 914 (citations omitted).

*Duncan*, 101 Hawai'i at 276, 67 P.3d at 775 (quoting *Nelson v. Univ. of Hawai'i*, 97 Hawai'i 376, 384-85, 38 P.3d 95, 103-04 (2001)); *see also United States v. Mitan*, 966 F.2d 1165, 1176 (7th Cir. 1992)(holding that there was no abuse of discretion when trial court excluded testimony of proposed defense witness offered on surrebuttal because witness was available to testify during defendant's case in chief and delay may have been strategic).

Lankford contends that the Circuit Court's discretion should be read more narrowly than the general rule outlined in *Duncan* because *Duncan* involved the admission of rebuttal testimony submitted by the State. The decision whether to allow a criminal defendant to submit surrebuttal testimony, Lankford argues, is infused with constitutional implications that require admission of the evidence that might reasonably be refused if offered by the State. Nothing in the cases referred to by Lankford, however, reflects a different level of discretion available for trial courts considering whether to allow rebuttal/surrebuttal testimony, or in the standard of review that

we apply to the trial court's decision on whether to allow such testimony. *Cf. State v. Altergott*, 57 Haw. 492, 508, 559 P.2d 728, 738-39 (1977) (trial court did not abuse its discretion in refusing to allow a continuance so that the defense could locate one of its witnesses for recall).

Lankford elected not to call his reconstruction witness during his case-in-chief despite repeated warnings.[5] The law itself, however, made Lankford's plan to defer his reconstruction witness to surrebuttal a risky one. Trial judges have the authority to exercise reasonable control over the order in which witnesses are presented during trial. Haw. R. Evid. 611(a) (1993).

In light of the trial sequence, the numerous warnings afforded by the Circuit Court, and the fact that we must find an abuse of discretion before we may intervene, it was a reasonable exercise of the Circuit Court's discretion to require that Lankford call his accident reconstruction witness during his case-in-chief, and to deny his motion to present Calhoun as a surrebuttal witness.

"An abuse of discretion occurs when the decisionmaker exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *State v. Vliet*, 95 Hawai'i 94, 108, 19 P.3d 42, 56 (2001) (quoting *In re Water Use Permit Applications*, 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000)) (internal quotation marks omitted). Since the trial court had broad authority to exercise reasonable control over the order in which witnesses were presented, since the State's accident reconstruction witness testified that it was possible for Watanabe to have jumped out of Lankford's truck, and since Lankford's offer of proof in support of the motion was limited to

---

[5] We reiterate our earlier admonition that "[t]o the extent that evidentiary issues are of concern to one or more parties, they should be anticipated, raised, and settled during pretrial proceedings. It is very risky to rest one's case in chief upon the expectation that relevant evidence may be introduced via rebuttal or surrebuttal." *Yorita v. Okumoto*, 3 Haw. App. 148, 156, n.10, 643 P.2d 820, 826, n.10 (1982).

bolstering of the Second Incident only,[6] the Circuit Court did not abuse its discretion.

   2.   Right to Compulsory Process

The Circuit Court's decision did not violate Lankford's right to compulsory process.  Compulsory process "does not guarantee the right to compel attendance and testimony of all potential witnesses absolutely." *State v. Mitake*, 64 Haw. 217, 224, 638 P.2d 324, 329 (1981).

The Circuit Court found that Lankford purposely delayed calling his accident reconstruction witness in order to gain a tactical advantage.  In an analogous circumstance, when a party willfully fails to comply with a trial court's instructions regarding discovery, a trial court's preclusion of witness testimony does not violate the Compulsory Process Clause.  *Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (affirming exclusion of testimony of defense witness in trial for attempted murder when defendant had failed to timely disclose witness in order to gain a tactical advantage); *see also Myers v. Frye*, 401 F.2d 18, 21 (7th Cir. 1968) (holding that denial of defendant's proposed surrebuttal testimony did not violate Sixth Amendment right to compulsory process because testimony was not excluded as a result of a broad arbitrary limitation).

Compulsory process is critical to assuring a defendant the right to a meaningful defense and a fair trial.  In this case, however, Calhoun was not precluded from testifying; rather, he was precluded from testifying on surrebuttal.

B.   Ineffective Assistance of Counsel

Lankford argues that his counsel's failure to call Calhoun during his case-in-chief deprived him of the defense that the First and Second Incidents had occurred as he had testified.

---

[6]   We consider the offer of proof made by Lankford during the April 8, 2008 hearing on his motion to allow surrebuttal witnesses rather than his offer of proof placed on the record on April 10, 2008.  Lankford's April 10th offer, made after the Circuit Court's ruling, did not present evidence or arguments that could not have been offered during the initial motion to allow surrebuttal witnesses.

Therefore, Lankford contends that he was deprived of his constitutional right to effective assistance of counsel under the 6th and 14th amendments to the United States Constitution and article I, § 14 of the Hawai'i Constitution.

The standard of review for claims of ineffective assistance of counsel on appeal is whether, "viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases." *Dan v. State*, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (quoting *State v. Antone*, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980)) (internal quotation marks and brackets omitted). "[An a]ppellant carries the burden of establishing ineffective assistance of counsel . . . . [and] must show that there were specific errors or omissions reflecting counsel's lack of skill, judgment or diligence, and [that] these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *State v. Montalbo*, 73 Haw. 130, 145, 828 P.2d 1274, 1283 (1992) (internal quotation marks, citations, brackets and ellipses omitted) (holding that defendant failed to establish ineffective assistance when he failed to show what expert witness would have done to alter the court's decision). "Specific actions or omissions alleged to be error but which had an obvious tactical basis for *benefitting* the defendant's case will not be subject to further scrutiny." *Briones v. State*, 74 Haw. 442, 462-63, 848 P.2d 966, 976 (1993).

Whether Lankford's accident reconstruction witness could be called on surrebuttal was a matter within the Circuit Court's discretion, and was a close issue as evidenced by the fact that as late as the day before the State closed its rebuttal case, the Circuit Court noted that the defense still needed to advise whether it would be calling surrebuttal witnesses.

The record shows that defense counsel considered the matter and made a strategic decision to delay calling his accident reconstruction witness until surrebuttal in the hope of gaining the tactical advantage of having his witness be available to comment on the testimony of the State's witness. *See State v. Richie*, 88 Hawai'i 19, 39-40, 960 P.2d 1227, 1247-48 (1998)

("[M]atters presumably within the judgment of counsel, like *trial strategy*, 'will rarely be second-guessed by judicial hindsight.'"); *Dan*, 76 Hawai'i at 430, 879 P.2d at 535 (defense counsel's failure to present expert testimony was not ineffective assistance of counsel as the relevant information had been introduced through another witness). In light of counsel's successful cross-examination of Baker, and the tactical basis for his decision, we can not conclude that counsel's decision to defer Calhoun until surrebuttal, even in the face of the Circuit Court's warnings, was outside the range of competence demanded of attorneys in criminal cases.

    C.    Jury Instructions Regarding Murder by Omission

Lankford was charged with murder in the second degree, which could be proved "by commission" or "by omission." In his third and fourth points of error, Lankford argues that the jury instructions regarding the "by omission" alternative were prejudicially insufficient, erroneous, and misleading because the Circuit Court failed to accurately define the term "crime," or to specify that the intentional or knowing state of mind applied to each element of the "by omission" charge. Lankford does not reference where in the record these errors were objected to or brought to the court's attention. Haw. R. App. P. 28(b)(4)(iii). Consequently, we review for plain error. *State v. Nichols*, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006).

Any prejudice associated with the Circuit Court's failure to define "crime" is made moot by the fact that the jury unanimously found Lankford guilty under both of the alternatives, and the State elected to proceed on the "by commission" alternative. "A case is moot where the question to be determined is abstract and does not rest on existing facts or rights." *State v. Fukusaku*, 85 Hawai'i 462, 474, 946 P.2d 32, 44 (1997) (because defendant's allegedly unlawfully obtained statement was never introduced into evidence the issue was moot).

Lankford argues that the instructions related to the "by omission" alternative remain critical despite the State's election, because "the jury's verdict may have been based solely

14

on a finding of guilt on the murder by omission alternative."
The jury, however, affirmed that it had unanimously found that:

> [T]he prosecution proved beyond a reasonable doubt that, on or about the 12th day of April, 2007, in the City and County of Honolulu, State of Hawaii, the Defendant, KIRK MATTHEW LANKFORD, intentionally or knowingly caused the death of Masumi Watanabe[.]

and

> [T]he prosecution proved beyond a reasonable doubt that, on or about the 12th day of April, 2007, in the City and County of Honolulu, State of Hawaii, the Defendant, KIRK MATTHEW LANKFORD, caused the death of Masumi Watanabe by intentionally or knowingly failing to obtain or attempt to obtain aid from law enforcement or medical personnel although he could have done so without danger or peril to any person, which is a duty imposed by law upon a person present at the scene of a crime who knows that the person against whom the crime was committed was suffering from serious physical harm, intending or knowing that his failure to perform this duty would result in the death of Masumi Watanabe[.]

The jury's response does not allow the possibility that the jury's verdict may have been based solely on the murder by omission alternative. As a result, any prejudice associated with the Circuit Court's failure to specify that the intentional or knowing state of mind applied to each element of the murder by omission charge was also made moot. *See State v. Valentine*, 93 Hawai'i 199, 201-02, 210, 998 P.2d 479, 481-82, 490 (2000) (whether the jury instruction was incomplete was moot because defendant was convicted of a lesser included offense and re-prosecution was therefore barred).

> D.    Denial of Lankford's Motion to Continue

"A motion for continuance is addressed to the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion." *State v. Lee*, 9 Haw. App. 600, 603, 856 P.2d 1279, 1281 (1993).

Lankford first requested during jury *voir dire* that the trial be continued because he needed additional time to prepare to cross-examine Dr. Kanthi DeAlwis. A week earlier, the State had advised that it was intending to present Dr. DeAlwis, a forensic pathologist, who would testify to conclusions that might be drawn from scratches on Lankford's hands during the State's

15

case-in-chief rather than on rebuttal as the State had originally indicated. The Circuit Court denied Lankford's motion, noting that he had not shown any prejudice or that he would be unable to have his own expert witness reach a conclusion about the scratch marks before the State's case would be presented in several weeks. Three weeks later, Lankford renewed his motion, but the Circuit Court again denied the motion, noting that counsel had weeks to prepare for the issue.

Lankford did not demonstrate due diligence in analyzing the photos or in preparing for cross examination, that substantial favorable evidence would have been tendered if he had more time to prepare, or that he was materially prejudiced by the denial of his motion. Consequently, any error was harmless beyond a reasonable doubt. Haw. R. Pen. P. 52(a); Haw. R. Evid. 103(a).

In addition, Lankford was not appreciably prejudiced when his counsel was able to cross-examine the State's expert, and elicited the testimony of his own expert on the matter during the defense's case-in-chief, through which he was able to expose "discrepancies in [Dr. DeAlwis'] claims as to the age and stages of healing of the wounds, which were inconsistent with the wounds having been sustained on the date of the incident."

"The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Plichta, 116 Hawai‘i 200, 214, 172 P.3d 512, 526 (2007) (quoting State v. Ganal, 81 Hawai‘i 358, 373, 917 P.2d 370, 385 (1996)) (internal quotation marks omitted). In denying Lankford's motion to continue, the Circuit Court did not clearly exceed the bounds of reason, or disregard rules or principles of law or practice, when counsel was afforded a month's notice of the need to advance his preparation to cross-examine Dr. DeAlwis. Neither did Lankford demonstrate that the decision caused him any substantial detriment. Consequently, the Circuit Court did not err in denying Lankford's motion to continue.

E.    Admission of Photographs of Lankford's Wife

Lankford contends that the Circuit Court abused its discretion and denied him due process by admitting photographs of his wife into evidence "to establish the highly-prejudicial inference that [Lankford] had an affinity for small Asian women." Although we question the relevance of the evidence, we disagree that the inference was highly-prejudicial.

> "The responsibility for maintaining the delicate balance between probative value and prejudicial effect lies largely within the discretion of the trial court." *State v. Iaukea*, 56 Haw. 343, 349, 537 P.2d 724, 729 (1975) (citations omitted). Moreover, the "admission or rejection of photographs is a matter within the discretion of the trial court; consequently, unless there is a showing of an abuse of discretion, the trial court's ruling will not be disturbed on appeal." *State v. Edwards*, 81 Hawaiʻi 293, 297, 916 P.2d 703, 707 (1996).

*State v. Brantley*, 84 Hawaiʻi 112, 118, 929 P.2d 1362, 1368 (App. 1996).

The photographs of Lankford's wife were ruled to be admissible to show that Lankford "had an association to Asians of a slim build." "The test determining whether photographs may be shown to the jury is not whether they are necessary, but whether their probative value outweighs their possible prejudicial effect." *State v. Apao*, 59 Haw. 625, 639, 586 P.2d 250, 260 (1978) (quoting *People v. Steger*, 546 P.2d 665, 674 (1976)).

The photographs in question tended to establish that Watanabe and Lankford's wife shared similar features. The prosecution argued that this correlation went to motive, but did not persuasively explain the theory. Ultimately, given the evidence in the case, we find no particular probative value; nevertheless, we determine no prejudicial effect.

The photographs of Lankford's wife were largely irrelevant to any reasonable argument that the prosecution made or might have made. Lankford's "association to Asians of a slim build" had no relationship to anything that the prosecution needed to prove once Lankford admitted that Watanabe had been in his truck. Nevertheless, since Lankford had yet to admit to encountering Watanabe at the time that the prosecution presented the photographs, the Circuit Court did not abuse its discretion

17

by admitting them.[2/]

F.    Prosecutorial Misconduct

Lankford contends that egregious misconduct of the prosecutor deprived him of his constitutional right to a fair trial, and should bar him from reprosecution.  The bulk of the examples to which Lankford points were not objected to at trial.

> "If defense counsel does not object at trial to prosecutorial misconduct . . . [w]e may recognize plain error" when the error committed affects substantial rights of the defendant. *State v. Wakisaka*, 102 Hawaiʻi 504, 513, 78 P.3d 317, 326 (2003) (internal quotation marks and citations omitted).  In reviewing a prosecutor's comments for misconduct, the appellate court considers three factors: (1) the nature of the conduct, (2) "the promptness or lack of a curative instruction," and (3) "the strength or weakness of the evidence against defendant." *Id.*, at 515, 78 P.3d at 328 (2003) (quoting *State v. Clark*, 83 Hawaiʻi 289, 304, 926 P.2d 194, 209 (1996) (internal quotation marks omitted)).  If the conduct was improper, the court then asks whether the misconduct was harmless beyond a reasonable doubt, and if not, whether the misconduct was "so egregious as to bar reprosecution." *State v. Maluia*, 107 Hawaiʻi 20, 26, 108 P.3d 974, 980 (2005).

*State v. Condon*, No. 29676, 2010 WL 2624909, at *1 (Haw. Ct. App. June 29, 2010).

1.    Opening Statement; PowerPoint Slide Labeling
      Location as "Abduction Site"

Lankford argues on appeal that prosecutorial misconduct occurred at trial because the prosecutor utilized a PowerPoint slide that labeled the location where Lankford first encountered Watanabe as the "abduction site" during the State's opening statement.  Lankford did not object to the prosecution's use of the slide at trial.

"Generally, an opening statement merely provides an opportunity for counsel to advise and outline for the jury, the facts and questions in the matter before them.  Thus, an attorney's opening statement is not an occasion for argument." *State v. Valdivia*, 95 Hawaiʻi 465, 480, 24 P.3d 661, 676 (2001) (internal quotation marks, citations, and brackets omitted).  In

---

[2/]    In addition, since there was no discernible prejudical effect associated with admission of the photographs, any error was harmless, and could not have contributed to Lankford's conviction.  Haw. R. Pen. P. 52(a); *State v. Pauline*, 100 Hawaiʻi 356, 378, 60 P.3d 306, 328 (2002).

*Valdivia*, the prosecutor improperly commented during his opening statement that the defendant had gone on a "rampage of terror" in which he "almost killed at least 100 people", and said that the defendant acted "like a dog" in staring at the victim. 95 Hawai'i at 481, 24 P.3d at 677. The Hawai'i Supreme Court, however, found that because the court had instructed the jury that statements made during opening statements were not evidence, the misconduct was harmless beyond a reasonable doubt. *Id.*

Similarly, in this case, Lankford was not prejudiced by the use of the label "abduction site." Applying the *Valdivia* factors: (1) there was enough evidence on which to base Lankford's conviction; (2) the jury was instructed that statements or remarks made by counsel are not evidence; and (3) there was no indication in the record that the jury did not adhere to these instructions. In addition, it was reasonable for the prosecutor to argue that Watanabe had been abducted since there was evidence that: (1) Watanabe looked distressed when she was talking with Lankford; and (2) Watanabe was shy and uncomfortable with strangers, and would not be likely to get into a stranger's truck.

### 2. Introduction Of Photographs Of Lankford's Wife

In addition to contending that the introduction of the photographs of Lankford's wife were more prejudicial than probative, and hence amounted to an abuse of discretion, *supra*, Lankford also contends that introduction of the photos amounted to prosecutorial misconduct.

In view of the fact that the Circuit Court overruled Lankford's objection to the proposed introduction of the photographs, and that we concluded above that the Circuit Court did not abuse its discretion in doing so, we do not find any misconduct on the part of the prosecutor in seeking to introduce the photos into evidence.

### 3. Appeal To Jurors' Emotions During Closing Argument

Lankford argues that the prosecutor committed misconduct by improperly appealing to the jurors' emotions during

closing argument by: (1) showing them a photograph with a silhouette of Lankford with a hole where his heart should have been, labeled "Absence of conscience"; (2) arguing that Lankford's treatment of Watanabe's body showed disrespect and a lack of empathy for her family; (3) using degrading and emotionally charged characterizations of Lankford as glib and superficially charming, manipulative, cold, calculating, narcissistic, grandiose, a control freak, disrespectful, and lacking empathy; and (4) telling the jurors not to reward Lankford for disposing of the body. Of these, Lankford only objected at trial to the "absence of conscience" label.

"In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record." *State v. Rogan*, 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999) (quoting ABA Prosecution Function Standard 3-5.8(a) (3d ed. 1993)) (internal quotation marks omitted); *State v. Clark*, 83 Hawai'i 289, 306, 926 P.2d 194, 211 (1996) (finding no prosecutorial misconduct when prosecutor called defendant's denial of guilt a "cockamamie story"). "The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw . . . . Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct." *Rogan*, 91 Hawai'i at 413, 984 P.2d at 1239 (1999) (quoting ABA Prosecution Function Standard 3-5.8(a) (3d ed. 1993)) (internal quotation marks omitted) (finding prosecutorial misconduct when prosecutor made racially charged statements during closing argument).

Although Lankford objected to the PowerPoint silhouette labeled "Absence of conscience" during the pre-closing conference, he did not object to the prosecutor's related argument at the time that it was made to the jury.[8] The

---

[8]     [Prosecutor]: Lack of empathy. [Watanabe] placed in bait box, left in bait box for 12 hours, garbage bag placed over her head, duct taped and stuffed into garbage bags.

.  .  .  .

silhouette was merely a visualization of the prosecutor's assertion that Lankford had acted without conscience. As such, it was not error to allow the silhouette.

As to the other instances of alleged misconduct, Lankford did not object at trial and there was evidence that Lankford had disrespected Watanabe's body and did in fact possess the negative character traits described by the prosecution. By Lankford's own account, he wrapped Watanabe's body in plastic and hid it for most of a day in a storage container in his truck, put Watanabe's body into the ocean, and then lied to police when he was questioned regarding her disappearance. Other evidence suggesting that Lankford murdered Watanabe includes: (1) the discovery of Watanabe's blood in Lankford's work truck; (2) the testimony of Watanabe's mother suggesting that Watanabe would not get into a stranger's car; and (3) the witness testimony suggesting that Watanabe appeared distressed when talking to Lankford. In sum, the prosecution's argument and characterizations were based on reasonable inferences from the evidence presented at trial.

4.    Suggestion of Tailored Testimony

Lankford contends that the prosecutor committed misconduct when he commented during the State's closing argument that Lankford had tailored his testimony after becoming aware of the evidence when it was presented during discovery and at trial.

At trial, the State asserted the following during closing argument:

> Defendant admits that [Watanabe] was in the car when he takes the witness stand. Did he admit that in April of 2007? Why is he admitting it now? DNA, glasses, eyewitnesses, oh, a little bit hard to deny

---

> Okay. Essentially, it's hit and run when somebody leaves after an incident. It's not hit, run, bag and bury.

> Appearance and demeanor, manner of testimony. It would suggest to you that if you look at this, evaluate the coldness and callousness of what he said, how he said and what he did, it would suggest to you that in regards to his behavior on April 12, 2007, an absence of conscience and any recognition of empathy for the victim in this case, including her loved ones.

21

it.

> . . . He's got a new story, because he's got new awareness of the evidence. Clearly tailoring from what he said before, to the time he gets here and tells you today from the witness stand.

"[I]t would be improper, under article I, section 14 of the Hawaiʻi Constitution, for the prosecution to make generic accusations during closing argument that a defendant tailored his testimony based solely on the defendant's exercise of his constitutional right to be present during the trial." *State v. Mattson*, 122 Hawaiʻi 312, 326, 226 P.3d 482, 496 (2010); *State v. Walsh*, 123 Hawaiʻi 284, 289-90, 231 P.3d 1001, 1006-07 (App. 2010); see also *Portuondo v. Agard*, 529 U.S. 61, 80 (2000) (Ginsburg, J., dissenting). However, when "the prosecution refer[s] to specific evidence presented at trial *in addition* to . . . [the defendant's] presence at trial, it cannot be said that the prosecutor's remarks during closing argument constituted a 'generic accusation' that [defendant] tailored his testimony based *solely* on his presence at trial. [Under such] circumstances, . . . the prosecutor's comments [do] not violate [the defendant's] constitutional right to be present at trial under article I, section 14 of the Hawaiʻi Constitution." *Mattson*, 122 Hawaiʻi at 327, 226 P.3d at 497; *Walsh*, 123 Hawaiʻi at 289, 231 P.3d at 1006.

The instant case is similar to *Mattson* in that the prosecutor referenced specific evidence supporting his tailoring charge including Lankford's pre-trial statement to the police that he had never met Watanabe, which directly contradicted his trial testimony that she had died jumping out of his truck. Thus, the prosecutor's suggestion that Lankford tailored his testimony did not violate Lankford's constitutional rights.

G.   Inconsistent Verdicts

Lankford contends that the verdicts of murder by omission and murder by commission are factually inconsistent and cannot be resolved to present a coherent view of the case. "When faced with a claim that verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as

expressing a coherent view of the case[.]" *Carr v. Strode*, 79 Hawai'i 475, 489, 904 P.2d 489, 503 (1995) (quoting *Toner v. Lederle Laboratories*, 828 F.2d 510, 512 (9th Cir. 1987)) (internal quotation marks omitted); *see also State v. Yoshimoto*, 64 Haw. 1, 2, 635 P.2d 560, 561 (1981) (holding that verdicts were not inconsistent when, based on the evidence, the jury could have found facts rendering verdicts consistent).

To prove the charge of murder in the second degree by commission, the State was required to prove that Lankford intentionally or knowingly committed an act that caused Watanabe's death. To prove murder by omission, the State needed to prove that Lankford murdered Watanabe by intentionally or knowingly failing to seek and obtain medical treatment for Watanabe in contravention of his duty to do so. *See State v. Batson*, 73 Haw. 236, 249-54, 831 P.2d 924, 931-34 (1992).

Lankford testified at trial that he struck Watanabe with his work truck. The State's witnesses also testified that Watanabe's blood and glasses were found inside Lankford's work truck.

The jury could reasonably have concluded that Lankford intentionally hit Watanabe with his truck in order to inflict injuries upon her which turned out to be life threatening, but not immediately fatal. Alternatively, the jury could have concluded that Lankford attacked Watanabe while she was in his truck and inflicted life threatening, but not immediately fatal injuries upon her. There are a number of possible scenarios that the jury could have reasonably believed in order to find Lankford guilty of both murder by omission and commission. *See People v. Deacon*, 473 N.E.2d 1354, 1360 (Ill. App. Ct. 1985) (holding that guilty verdicts of both murder and involuntary manslaughter were not legally inconsistent); *State v. Fernandez*, 604 A.2d 1308, 1320 (Conn. App. Ct. 1992) (holding that guilty verdicts for assault in the first degree and attempted murder were not inconsistent because the jury could have found that defendant's intent changed during his attack on the victim). Therefore, the verdicts here were not inconsistent.

H.    Substantial Evidence

Lankford argues that there was no substantial evidence to support his conviction for second degree murder.  When reviewing the record for substantial evidence, the evidence presented at trial must be considered in the strongest light for the prosecution.  *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241.

There was substantial evidence to support the jury's verdict that Lankford committed murder by commission: (1) multiple eyewitnesses testified to seeing Watanabe get into Lankford's work truck on the morning she disappeared; (2) Watanabe's blood and glasses were found in Lankford's work truck; (3) a witness testified to seeing Lankford digging a hole in an isolated area on the night of Watanabe's disappearance; (4) after initially denying that he had ever seen Watanabe, Lankford admitted to his involvement in her death and to disposing of her body; and (5) Lankford admittedly prevented Watanabe's body from being examined.  *See State v. Torres*, 122 Hawai'i 2, 14, 222 P.3d 409, 421 (App. 2009) (finding substantial evidence for murder conviction even though victim's body was never found when victim was last seen with defendant, items belonging to victim were found in defendant's car, defendant had made self-incriminating statements to others, and weapons were found in defendant's car), *aff'd*, 2011 WL 1549526, *1 (Haw. April 15, 2011).

I.    Denial of Sanctions Against Defense Counsel

In its cross appeal, the State argues that it was an abuse of discretion for the Circuit Court to deny the State's motion for sanctions because defense counsel embarked on a course of conduct in which he refused to comply with the Circuit Court's discovery orders.

"A court has broad discretion in the decision to impose discovery sanctions."  *Montalbo*, 73 Haw. at 135, 828 P.2d at 1278 (decision to lift sanctions was not an abuse of discretion).  "[I]f a party has failed to comply with a discovery order, the court may 'order such party to permit the discovery, grant a continuance, or it may enter such other order as it deems just under the circumstances.'"  *Id.*  "[W]hile sanctions are designed

to accomplish the purpose of discovery . . . it is clear that the imposition of sanctions should not encroach on a fair trial." *State v. Ahlo*, 79 Hawai'i 385, 399, 903 P.2d 690, 704 (App. 1995) (quoting *People v. Rayford*, 356 N.E.2d 1274, 1277 (1976)) (internal quotation marks and brackets omitted).

"[W]hen a criminal defendant violates Rule 16 by failing to disclose to the prosecutor evidence intended to be used at trial, the trial court must consider the following: (1) whether the defendant was acting maliciously or in bad faith; (2) the extent of prejudice to the prosecution caused by the violation; (3) whether the prejudice could have been cured by measures less severe than excluding evidence; and (4) any other relevant circumstances." *Ahlo*, 79 Hawai'i at 400, 903 P.2d at 705; *State v. Inman*, 121 Hawai'i 195, 199, 216 P.3d 121, 125 (App. 2009) (holding that preclusion of witness testimony was abuse of discretion).

The Circuit Court found that defense counsel had been trying to protect his client's rights, and that the trial was very complex. In its conclusions of law, the Circuit Court held that defense counsel failed to comply with his discovery obligations, but did not identify any harm to the State. As a result, the Circuit Court did not abuse its discretion in declining to sanction defense counsel.

III. CONCLUSION

The Circuit Court's July 31, 2008 Judgment and September 10, 2008 Order Denying Sanctions are affirmed.

DATED: Honolulu, Hawai'i, May 13, 2011.

On the briefs:

Jon N. Ikenaga,
Deputy Public Defender,
for Defendant-Appellant/
      Cross-Appellee

Donald L. Wilkerson,
Cross-Appellee

  Donn Fudo,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee/
      Cross-Appellant

Presiding Judge

Associate Judge

Associate Judge